IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jeffery Cox,

                Plaintiff,

      v.

Board of County Commissioners
of Franklin County, Ohio,

                Defendants.

Case No. 2:18-cv-1631

Judge Graham

Magistrate Judge Jolson

Opinion and Order

Plaintiff Jeffery Cox brings this citizen suit under the Clean Water Act, 33 U.S.C. § 1365, against defendant Board of County Commissioners of Franklin County, Ohio. Cox alleges that there are discharges of sewage into numerous waterways in Franklin County and that the discharges are caused by home sewage treatment systems ("HSTSs") connected to the County's municipal separate storm sewer system ("MS4"). Cox contends that the County has violated the Act by not eliminating the illicit discharges to the MS4.

This matter is before the Court on several motions for summary judgment, including one filed by the County in which it argues that Cox's citizen suit is precluded by the CWA's "diligent prosecution bar." The bar provides that no private action may be commenced if the United States or a state Environmental Protection Agency is diligently prosecuting a suit to require compliance with the same standard or limitation at issue in the citizen complaint. 33 U.S.C. § 1365(b)(1)(B). The County argues that the Ohio EPA brought such a suit in state court, resulting in a consent decree which has the effect of barring Cox's citizen suit.

For the following reasons, the Court grants in part and denies in part the County's motion with respect to the diligent prosecution bar. Of the claims that are not barred, the Court finds that the County is entitled to summary judgment on the merits of all but one claim.

## I.    Facts

### A.    Background of the Parties and the Ohio EPA

Franklin County operates the MS4, which is a "system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, [and] storm drains)" designed to collect and convey "storm water." 40 C.F.R. § 122.26(b)(8). "Storm

water" includes "runoff, snow melt runoff, and surface runoff and drainage." *Id.*, § 122.26(b)(13). The storm water gathered by the MS4 discharges to surface waters of the State at points called outfalls. *Id.*, § 122.26(b)(9). The County is responsible for hundreds of outfalls, including ones which discharge to the Alum Creek, Big Darby Creek, Big Walnut Creek, Blacklick Creek, Hellbranch Run, Little Darby Creek, Olentangy River, Rocky Fork Creek, Scioto River and Walnut Creek.

The Ohio EPA, pursuant to authority granted to it under the CWA, has issued a general permit authorizing small municipal separate storm systems[1] in Ohio to discharge storm water to the waterways of the State. The permit is known as National Pollutant Discharge Elimination System ("NPDES") Permit Number 0HQ000003. *See* Doc. 3-1. Franklin County applied for and was granted coverage to operate its MS4 under the general permit; the County was assigned Permit Number 4GQ10009*CG. *See id.* at PAGEID 70.

Plaintiff Jeffery Cox is a Franklin County resident. He lives in Sharon Township and his home is on a street, West Kanawha Avenue, where stormwater is collected by the County's MS4 and discharged to the nearby Olentangy River, about 1,800 feet away from his home. Cox Decl. (Doc. 16-7), ¶ 6. When Cox moved into his home in 2016, he began to notice sewage odors and gases being emitted from the storm sewer and curb inlets on his street. *Id.*, ¶ 7. Cox alleges that discharges of sewage from HSTSs in his neighborhood are responsible for the noxious emissions. *Id.*, ¶¶ 7–8. In his observation, the HSTSs in his neighborhood have aerators (which introduce oxygen to the treatment process, *see* Robinson Dep. at 36) that connect to discharge to the storm sewer. *Id.*, ¶ 7.

Cox believes that the problems he has observed in his neighborhood are not isolated. The County conducts water quality tests, known as dry weather screenings. According to Cox, results from past screenings show unacceptably high pathogen levels and indicate illicit discharges, including sewage, at hundreds of outfalls throughout the County's MS4. Cox alleges that HSTSs are the primary cause.

### B. The County's NPDES Permit

The County's Permit allows it to discharge storm water from the MS4 to surface waters of the State. It requires the County to "develop, implement, and enforce" a Storm Water Management

---

[1] There is no dispute that the County's MS4 qualifies as "small" under 40 C.F.R. § 122.26(b)(16). *See* Robinson Dep. (Doc. 15-1) at 13. Generally, small MS4s serve fewer than 100,000 people in an urban area. 40 C.F.R. § 122.26(b)(16)(ii).

Program ("SWMP") that is "designed to reduce the discharge of pollutants from [the] small MS4 to the maximum extent practicable." NPDES Permit (Doc. 3-1), Part III.A.1.

The SWMP must include six components called "minimum control measures": (1) public education and outreach on storm water impact, (2) public involvement/participation, (3) illicit discharge detection and elimination, (4) construction site storm water runoff control, (5) post-construction storm water management in new developments and redevelopment projects, and (6) pollution prevention for municipal operations. *Id.*, Part III.B. For each minimum control measure, the County's SWMP must provide a description of "best management practices" that the County either has implemented or will implement, along with identifying "measurable goals" and persons responsible for implementing or coordinating those practices. *Id.*, Part III.A.1.

Of particular importance to this lawsuit is the third minimum control measure – illicit discharge detection and elimination ("IDDE"). The Permit defines an illicit discharge as any discharge to the MS4 "that is not entirely composed of storm water." *Id.*, Part VI. The County "shall develop, implement and enforce a program to detect and eliminate illicit discharges" to the MS4. *Id.*, Parts III.B.3. and III.B.3.e. To that end, the County must develop a comprehensive map of the MS4 and submit a list and a map of on-site sewage disposal systems, including HSTSs, "connected to discharge to [the] MS4." *Id.*, Part III.B.3.b–c. Further, the County shall "to the extent allowable under State or local law, effectively prohibit, through ordinance, or other regulatory mechanism, illicit discharges into [the] storm sewer system and implement appropriate enforcement procedures and actions." *Id.*, Part III.B.3.d.

The IDDE component further provides that the County must identify residences with HSTSs "that can be legally, feasibly and economically connected to central sewers." *Id.*, Part III.B.3.e.i. The County must work with the local board of health to determine "if existing discharging HSTSs are operating as designed and intended" and, for those which are not, the County must require "elimination, upgrade or replacement" of the HSTS. *Id.*, Part III.B.3.e.ii. "For HSTS discharges that cannot be eliminated through connection to central sewers or installation of soil absorption systems, the property owner must be notified of the requirement to pursue coverage under an appropriate Ohio EPA general NPDES permit." *Id.*

The County is to conduct dry weather screenings at outfalls and investigate the source of any contamination identified by a screening. *Id.*, Parts III.B.3.e.iii and III.B.3.i.iv. When the source of contamination is a "discharging HSTS that is not operating as designed and intended," elimination by way of connecting the HSTS to the central sanitary sewer system is the "preferred alternative,"

"followed by replacing [the] system with a soil absorption system that does not discharge," and "allowing a replacement discharging HSTS." *Id.*, Part III.B.3.e.iii. When these options for elimination are not available, the County is to notify the property owner of "the requirement to pursue coverage under an appropriate Ohio EPA general NPDES permit." *Id.*

The County is expected to work with "local waste water authorities, planning agencies or other appropriate agencies involved to evaluate the planned or possible future installation of sewers for areas which contain high densities of discharging HSTSs." *Id.*, Part III.B.3.e.iv.

The County must submit an annual report detailing, among other things, the number of illicit discharges identified, the number of illicit discharges eliminated, and "a list of all illicit connections that have been identified but have yet to be eliminated." *Id.*, Part III.B.3.k.

### C. Ohio EPA's 2017 Letter to the County

On June 28, 2017 the Ohio EPA issued a letter to the County regarding its Permit. *See* Doc. 15-3 at PAGEID 446. The letter stated that the Ohio EPA had conducted a review of the County's SWMP and found several deficiencies. One of those deficiencies concerned the IDDE, specifically the map and list of HSTSs connected to discharge to the MS4. The letter reminded the County that it was a requirement of the SWMP to provide such a map and list.

Accompanying the letter was an SWMP Review Checklist prepared by the Ohio EPA in January 2017. *Id.* at PAGEID 449. Among the deficiencies noted on the checklist were the County's failure to provide a map of the MS4 as well as a map and list of the HSTSs which discharged to the MS4. *Id.* at PAGEID 451. The checklist also indicated that the County had not included in its SWMP a plan to eliminate illicit discharges that had not yet been removed at the end of the prior reporting period.. *Id.* at PAGEID 452.

There is no indication on the record before the Court whether or not the County responded to the Ohio EPA's letter.

### D. Plaintiff's August 2018 Notice of Intent to Sue

On August 20, 2018, Cox sent a Notice of Intent to Sue letter to the Franklin County Board of Commissioners, the Director of the Ohio Environmental Protection Agency, and the United States EPA. *See* Doc. 4-1. The Notice was prepared by legal counsel and was submitted to fulfill the notice requirement of the citizen suit provision of the CWA. *See* 33 U.S.C. § 1365(b)(1)(A).

In the Notice Cox alleged that the County had violated and was continuing to "violate effluent standards and limitations under the CWA by discharging unauthorized non-stormwater pollutants from the MS4 and by violating the conditions and requirements of the NPDES Permit."

Doc. 4-1 at PAGEID 139.  As he did in his complaint in this action, Cox alleged that he began noticing noxious sewage odors from the MS4 in his neighborhood in 2016.  He also smelled sewage odors from the outfalls at the end of two streets in his neighborhood, West Kanawha Avenue and Rosslyn Avenue, where the MS4 discharged to the Olentangy River.  In addition, he had observed discharges from those outfalls more than 72 hours after a rainfall event, suggesting that non-storm water had made its way into the MS4.  *Id.* at PAGEID 140-41.

Cox asserted that the problems he had noticed were not limited to his neighborhood and that there were "thousands of illicit connections to the MS4" in Franklin County.[2]  *Id.* at PAGEID 140.  He believed that HSTSs were the primary source of illicit discharges, "including failed HSTSs (those that are not operating as designed and intended)."  *Id.*

The Notice cited a spreadsheet document, from an unidentified source, that purported to be a 2010 inventory of aerobic treatment units ("ATUs"), or aerator-type HSTSs, discharging to the MS4.  The spreadsheet indicated that there were about 2,800 such HSTSs.  *Id.* at PAGEID 164-240.  The Notice further referenced a spreadsheet document compiled by Franklin County Public Health which listed instances where officials had verified the complaints they had received of illicit discharges into the MS4 from 2012 to 2016.  Doc. 4-2 at PAGEID 243–54.  Many, if not most, of the violations were attributed to a "non functional ATU."  *Id.*  The Notice also listed 163 dry weather screenings conducted from 2006 to 2017 that Cox alleged provided evidence of illegal discharges to the MS4.  Doc. 4-1 at PAGEID 143–49.

Cox asserted that the County had violated the NPDES Permit in many regards.  He alleged that the existence of non-storm water discharges to the MS4 was a violation.  He further asserted that the County had failed to trace and locate the sources of the illicit discharges to the MS4.  Cox also alleged that the County had failed to eliminate all illicit connections and discharges to the MS4.

Cox maintained too that the County had failed to create a map of the MS4 system, including one showing the location of all HSTSs connected to the MS4.  Relatedly, he asserted that the County

---

[2]  The terms "connection" and "connected" are used, but not defined, by the parties in reference to HSTSs which are "connected" to the MS4.  Based on the Court's reading of the record, including the expert reports and testimony, the terminology does not necessarily mean that there is a pipe or ditch providing a direct, physical connection from the outlet of the HSTS to the MS4.  Rather, what is more likely meant is that the effluent (the water discharged from the HSTS, *see* Oxford English Dictionary, *Effluent* (online ed. 2019)) drains or finds a pathway to the MS4, including by flowing through or on the ground or a drain field.  *See generally* United States EPA, *Types of Septic Systems*, https://www.epa.gov/septic/types-septic-systems.

had failed to compile a list of all HSTSs connected to the MS4. Cox further alleged that the County had failed in its obligations under the Permit to develop an SWMP and an IDDE Plan.

### E.    The Ohio EPA Files Suit Against the County

At the request of the Ohio EPA, the State of Ohio commenced a suit (the "State Action") on October 17, 2018 against the County in the Court of Common Pleas for Franklin County. *See* Doc. 3-2. The complaint alleged that the County had not complied with the NPDES Permit. In particular, the complaint alleged that the County had failed to submit a comprehensive map of the MS4 which included all of the required components and had failed to update the map on a regular basis. The complaint further alleged that the County had failed to provide an updated map showing all HSTSs connected to the MS4 and had failed to submit an updated list of all such HSTSs. According to the complaint, the map and list the County had previously supplied included only HSTSs installed after 1970 (when a local permitting requirement was implemented) and failed to account for systems installed earlier.

The Ohio EPA's complaint further asserted that the County had an obligation under the Permit to develop, implement and enforce a plan to identify and eliminate illicit discharges and to address non-storm water discharges. It alleged that the County had failed to evaluate HSTSs for non-storm water discharges and had failed to determine if existing HSTSs were operating as intended. The complaint claimed that the County had failed to identify residences with HSTSs that could be feasibly connected to the sanitary sewer system. And it alleged that the County had not worked with local agencies, including Franklin County Public Health, to develop a plan to connect residences to the sanitary sewer system.

### F.    The Consent Order

On November 9, 2018, the Ohio EPA published a proposed consent order in relation to the State Action. *See* Doc. 43-1 at PAGEID 1561. The Ohio EPA provided for a public comment period, and Cox submitted comments through his legal counsel. *See id.* at PAGEID 1564–70. In January 2019 Cox filed a motion for leave to file an *amicus curiae* brief in the State Action. He did not file a motion for leave to intervene even though it was acknowledged in the State Action that the Ohio EPA was prohibited under the applicable federal procedural regulations from opposing intervention. *See* Doc. 5-1 at PAGEID 294 (citing 40 C.F.R. § 123.27(d) (requiring that public participation in the state enforcement process be allowed through intervention, public comment, and citizen complaints)).

The Ohio EPA revised the proposed consent order after review of the public comments. On September 24, 2019, the Ohio EPA and the County filed a joint motion in the State Action for the court to enter the revised consent order. On January 15, 2020, the state court – over Cox's objections, discussed below – entered the revised Consent Order. *See* Doc. 51-1.

The Consent Order ordered and enjoined the County to comply fully with the NPDES Permit. Consent Order, ¶ 13. It required the County to submit an updated comprehensive storm sewer system map to the Ohio EPA within twelve months. *Id.*, ¶ 14(a). It required, within six months, for the County to submit a plan and a schedule to "identify and address all discharging and failing" HSTSs that discharge to the MS4, including HSTSs that the County did not yet have records for. *Id.*, ¶ 14(b). The plan had to include an updated list of all HSTSs discharging to the MS4 and an updated map of all such HSTSs. *Id.*

The Consent Order further required the County to submit within six months a plan and schedule to evaluate areas served by sanitary sewers. *Id.*, ¶ 14(c). For residences located in those areas but which are using a failing HSTS, the County was required to submit within six months a plan and schedule for connecting them to a sanitary sewer. *Id.*

The Consent Order contained a specific provision for the neighborhood in which Cox lives. It required the County to submit within twelve months an application to the Ohio EPA to install sanitary sewer lines to connect un-sewered residences on West Kanawha Avenue, Rosslyn Avenue, and the surrounding streets to the sanitary sewer system. *Id.*, ¶ 14(d).

The County was additionally required to submit within six months a plan and schedule to determine which other areas within the MS4 could be "legally, feasibly, and economically connected to sanitary sewers," and to also submit a schedule for connecting those areas to sanitary sewers. *Id.*

With respect to failing HSTSs that were discharging to the MS4 but could not be connected to sanitary sewers, the Consent Order required the County to submit within six months a plan and schedule for including them in the County's operation program. *Id.*, ¶ 14(e). When such HSTSs could not be connected to a soil absorption field or replaced, the County was required to notify property owners of their obligation to pursue coverage under the Ohio EPA's general NPDES permit to discharge wastewater from their HSTS. *Id.*

Regarding the plans and schedules to be submitted by the County, whenever the Ohio EPA notified the County of a deficiency or concern with those plans, the County had thirty days to respond to the Ohio EPA's notification. *Id.*, ¶ 14(k). When the Ohio EPA approved the plans and schedules, the County was required to implement them. *Id.*, ¶ 14(l).

The Consent Order also addressed the County's annual reporting obligations under the Permit. The Order required the County to update its list of all illicit connections to the MS4 that have been identified but not yet eliminated. *Id.*, ¶ 14(j). The County was further required to include estimated schedules for eliminating such connections in its next annual report and in all subsequent reports. *Id.*

The Consent Order contained miscellaneous provisions, including requiring the County to perform maintenance tasks at a County facility in Groveport, and assisting certain townships with employee training and with developing pollution prevention plans for their maintenance facilities. *Id.*, ¶¶ 14(g), (h), (i).

Finally, the Consent Order contained penalty provisions. It required the County to pay a $10,000 penalty within thirty days of entry of the Order. *Id.*, ¶ 15. The County was also required to pay an escalating penalty for failure to comply with the Order. *Id.*, ¶ 18. For violations of the Order lasting up to thirty days in duration, the penalty was $300 per day; for violations lasting between thirty and ninety days, a penalty of $600 per day; and for violations lasting longer than ninety days, a penalty of $1000 per day. *Id.*

### G. Cox's Objections to the Consent Order

After the Ohio EPA and the County presented the revised Consent Order, the state court granted Cox leave to file a supplemental *amicus curiae* brief, which he did. Cox noted that his public comments had secured some beneficial changes to the proposed decree, but he nonetheless urged the state court to reject the Consent Order. *See* State Action, *State v. Franklin Cnty. Bd. of Comm'rs*, Case No. 18-cv-8695, Supplement to *Amicus Curiae* Brief, p. 4 (filed Oct. 17, 2019).

As an initial matter, Cox argued that the State Action should be stayed pending the federal litigation before this Court. *Id.* He stressed his belief that he could secure a "more comprehensive remedy" through federal litigation than what the Consent Order would accomplish. *Id.*, p. 1. In his view, the federal action he filed concerned a broader set of violations than those at issue in the State Action.

Cox argued that the Ohio EPA had allowed the County to violate its Permit for many years and filed the State Action only in response to his Notice of Intent to Sue. He argued that the Consent Order would not result in the County's full compliance with the law. He considered the Order to be unsatisfactory because it did not strictly require elimination of non-storm water discharges caused by HSTSs, but rather allowed the County time to "address" failing HSTSs. *Id.*, p. 6. He maintained that the Order lacked meaningful deadlines and schedules for eliminating illicitly-

discharging HSTSs and lacked a requirement that HSTSs be connected to the central sewer in areas where it could be accomplished. According to Cox, the Order would allow the County to continue to violate its Permit "into the distant future." *Id.*, p. 5.

Finally, Cox claimed that the Consent Order's penalty provisions were insufficient because they would not deter the County from committing further violations.

The state court adopted the Consent Order without addressing the objections raised by Cox, who was a non-party and had not moved to intervene.

### H. The Federal Action

Cox filed this suit on December 10, 2018, two months after the State Action was filed. In his complaint, Cox recognized that the Ohio EPA had brought its own suit against the County, but he alleged that the State Action was inadequate and was not meant to require full compliance with the County's Permit. Much as he later argued in his *amicus* brief to the state court, Cox asserted in his federal complaint that the proposed consent order did not address the entire range of violations alleged in the federal action and that it would allow the County to continue violating the Permit because it lacked meaningful deadlines and did not strictly forbid illicit discharges.

The federal complaint contains ten causes of action. In Count One, Cox alleges that the County has violated its NPDES Permit by failing "to trace and locate sources of non-storm water discharged from outfalls" and by failing to "eliminate those sources." He cites the results of dry weather screenings as evidence that such discharges exist and are known to the County.

In Count Two, Cox alleges that the County has violated the Permit by failing to eliminate known illicit discharges to the MS4.

Count Three asserts that the County has violated the Permit by allowing discharges of non-storm water to the MS4. Cox again cites the dry weather screenings as evidence of violations.

In Counts Four and Six, which were previously dismissed for reasons discussed below, Cox alleged that the County had violated the Permit by failing to submit to the Ohio EPA a comprehensive storm sewer system map and a map and list of all HSTSs discharging to the MS4.

Count Five claims that the County violated the Permit's requirement for the County, through ordinance or other regulatory mechanisms, to prohibit illicit discharges to the MS4.

In Count Seven, Cox alleges that the County failed to reduce the discharge of pollutants from the MS4 to the maximum extent practicable, as required by the Permit.

Counts Eight and Nine assert violations related to the Permit's SWMP and IDDE provisions. Cox alleges in Count Eight that the SWMP submitted by the County lacks all of the

required content, including an updated map of the MS4, a list of HSTSs which discharge to the MS4, and a plan to eliminate sources of illicit discharges which have not yet been eliminated at the end of each annual reporting period. Cox alleges in Count Nine that the County's IDDE Plan fails to include provisions for tracing and eliminating illicit discharges to the MS4.

In Count Ten Cox claims that the County has been negligent in operating the MS4.

### I.      The Court's Opinion and Order on Defendant's Motion to Dismiss

The County filed a motion to dismiss that raised a number of issues, including standing, statute of limitations, inadequate notice, and the diligent prosecution bar. The Court largely denied the motion to dismiss, finding that Cox had standing to assert his claims and that he had timely filed suit. *See* Doc. 52. The Court further found that Cox's Notice of Intent to Sue satisfied the Clean Water Act's notice requirement for filing a citizen suit, 33 U.S.C. § 1365(b)(1)(A).

Turning to the CWA's diligent prosecution bar, the Court accepted the complaint's allegations as true that the State Action did not represent a diligent prosecution of the violations alleged by Cox in this action. The Court also made note that the County, in its motion to dismiss, had failed to explain or support its blanket assertion that the State Action and Consent Order encompassed all of the violations raised by Cox. But there were two exceptions: Counts Four (map) and Six (list). Cox conceded that the Ohio EPA had asserted the same claims in the State Action. And though Cox asserted that the State Action was not being diligently prosecuted, the failings he pointed to concerned claims or issues other than the map and list requirements. Thus, the Court dismissed Counts Four and Six.

### J.      The Pending Motions for Summary Judgment

Pending before the Court are three motions for summary judgment. Plaintiff has moved for summary judgment on Counts Two, Three, Five, Eight and Nine. Cox argues that there is no dispute that the dry weather screenings show that there have been illicit discharges to the MS4 for many years. According to him, the County has known that HSTSs are the primary source of the illicit discharges but has failed to eliminate them.

The County has filed two motions for summary judgment. One motion relates to the diligent prosecution bar, and the County argues that the Ohio EPA's filing of the State Action and the ensuing Consent Order entered by the state court have the effect of precluding Cox from pursuing all claims except Count Ten (common law negligence). The County's second motion for summary judgment is merits-based, and the County argues, among other things, that it has

implemented a comprehensive SWMP, is properly addressing illicitly-discharging HSTSs, and is in full compliance with its Permit.

## II.  Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

**III.    Defendant's Motion for Summary Judgment Based on the Diligent Prosecution Bar**

**A.    The Clean Water Act and the Permit System**

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits "'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe,* 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1311(a)). The Act authorizes the issuance of National Pollutant Discharge Elimination System permits, which "place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Id.*; 33 U.S.C. § 1342.

An NPDES permit "defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations" under the CWA. *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976); *see also S. River Watershed Alliance, Inc. v. DeKalb Cnty.*, 484 F.Supp.3d 1353, 1362–63 (N.D. Ga. 2020) ("The purpose of a NPDES permit is to transform generally applicable provisions of the CWA into specific obligations on the part of an individual polluter."). Therefore, "[n]oncompliance with a permit constitutes a violation of the Act." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (2000).

The United States EPA was charged with initially administering the NPDES permitting system. 33 U.S.C. § 1342(a). States may administer their own NPDES permit program upon applying to do so and receiving approval from the U.S. EPA. *Id.*, § 1342(b); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). State programs are subject to the same terms, conditions and requirements as apply to the federal program, and they are subject to U.S. EPA oversight. 33 U.S.C. § 1342(a)(3); *Home Builders*, 551 U.S. at 650. Ohio has received approval to administer its own NPDES permit program. 58 Fed. Reg. 7889-03 (Feb. 10, 1993), 1993 WL 30425.

A permit is required for a municipality to operate a separate storm sewer system. 40 C.F.R. § 122.26. The Ohio EPA obtained a general permit for small MS4s to be operated in the state. The Ohio EPA has authority under 40 C.F.R. § 122.28(d) to grant coverage to municipalities under the general permit, which it did for Franklin County. Doc. 3-1 at PAGEID 70.

Permits for MS4s "shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers" and "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system,

design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(ii),(iii).

To implement the requirements that permits effectively prohibit non-stormwater discharges and reduce the discharge of pollutants to the maximum extent practicable, the U.S. EPA has promulgated regulations governing the content of small MS4 permits. 40 C.F.R. §§ 122.28(d), 122.34. Permits must include "terms and conditions to reduce the discharge of pollutants from the MS4 to the maximum extent practicable." 40 C.F.R. § 122.34(a). To achieve that end, permits must require that the municipality submit a written storm water management program, or SWMP, which includes the six "minimum control measures" discussed in Part I.B. above in relation to Franklin County's Permit. Again, those measures are: (1) public education and outreach on storm water impact, (2) public involvement/participation, (3) illicit discharge detection and elimination, (4) construction site storm water runoff control, (5) post-construction storm water management in new developments and redevelopment, and (6) pollution prevention/good housekeeping for municipal operations. *Id.*, § 122.34(b)(1)–(6).

With respect to the IDDE Plan, the permit must at a minimum require the municipality to:

(A) Develop, if not already completed, a storm sewer system map, showing the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls;

(B) To the extent allowable under State, Tribal or local law, effectively prohibit, through ordinance, or other regulatory mechanism, non-storm water discharges into the storm sewer system and implement appropriate enforcement procedures and actions;

(C) Develop and implement a plan to detect and address non-storm water discharges, including illegal dumping, to the system; and

(D) Inform public employees, businesses, and the general public of hazards associated with illegal discharges and improper disposal of waste.

*Id.*, § 122.34(b)(3)(i).

The EPA regulations recommend, but do not mandate, that permitting authorities require that permit holders' IDDE Plan "include the following four components: Procedures for locating priority areas likely to have illicit discharges; procedures for tracing the source of an illicit discharge; procedures for removing the source of the discharge; and procedures for program evaluation and

assessment." *Id.*, § 122.34(b)(3)(iii). The County's NPDES Permit requires it to address these components in its IDDE Plan. *See* NPDES Permit, Part III.B.3.i.iv.

### B. Enforcement of CWA Violations

Federal and state authorities have the right to bring criminal and civil enforcement actions against persons who violate the CWA, including permittees who violate a condition or limitation of their NPDES permit. 33 U.S.C. § 1319. Federal and state authorities indeed bear the primary responsibility for enforcing the CWA. *See Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007); *Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007) ("The CWA gives primary enforcement authority to the EPA and state enforcement agencies.").

The CWA authorizes citizen suits in limited circumstances in order to "provide a second level of enforcement . . . as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." *Sierra Club*, 504 F.3d at 637; *see* 33 U.S.C. § 1365(a). Among the matters a citizen may seek to bring suit over are alleged violations of an NPDES permit. *See* 33 U.S.C. § 1365(a)(1), (f)(7) (providing that a citizen may commence a civil action for alleged violations of an "effluent standard or limitation," which is defined to include "a permit or condition of permit issued under section 1342").

A citizen suit may not be commenced unless two statutory requirements are satisfied. One is notice – a citizen may not commence an action "prior to sixty days after the plaintiff has given notice of the alleged violation" to the federal EPA, the state EPA where the alleged violation is occurring, and to the alleged violator. 33 U.S.C. § 1365(b)(1)(A). The notice must "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

As noted above, the Court found in its Opinion and Order on defendant's motion to dismiss that Cox's Notice of Intent to Sue satisfied the notice requirements of § 1365(b)(1)(A). *See* Doc. 52 at PAGEID 2001–04.

The second prerequisite to a citizen suit is that federal or state authorities are not diligently prosecuting the same violation alleged by the citizen. "The 60-day notice provides federal and state governments with the time to initiate their own enforcement actions." *Sierra Club*, 504 F.3d at 637. A citizen suit may not be commenced if the federal or state government "has commenced and is

diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(B). This is known as the diligent prosecution bar.

"Citizen lawsuits under the CWA have a merely 'interstitial' role; Congress did not intend for them to be even 'potentially intrusive' on agency discretion." *Karr*, 475 F.3d at 1197 (quoting *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 61 (1987)). Because citizen suits were "meant to supplement rather than to supplant governmental action," *Gwaltney*, 484 U.S. at 60, Congress authorized them "only when environmental officials '*fail* to exercise their enforcement responsibility.'" *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004) (quoting *Gwaltney*, 484 U.S. at 60) (emphasis in *Gallatin Steel*). *See also Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991) ("The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities."); *EPA v. City of Green Forest*, 921 F.2d 1394, 1403 (8th Cir. 1990) (noting that "the CWA was intended to be enforced primarily by the government").

Thus, "[i]f either the state or federal government is diligently prosecuting the Clean Water Act violation, a citizen suit for that same violation may not proceed." *Sierra Club*, 504 F.3d at 637. When determining if a citizen suit may go forward in the presence of a governmental enforcement action, the court conducts a two-part inquiry. First, does the governmental action "require compliance with the same standard, limitation, or order" at issue in the citizen suit? *Frilling v. Village of Anna*, 924 F.Supp. 821, 836 (S.D. Ohio 1996) (emphasis omitted). Second, is the governmental action being diligently prosecuted? *Id. See also DeKalb Cnty.*, 484 F.Supp.3d at 1365–66.

C.     **Discussion**

1.     **Compliance with the Same Standards**

"Generally speaking, when the contours of a private plaintiff's suit and the Government's suit coincide . . . the former must be dismissed." *Gallatin Steel*, 390 F.3d at 476 (citing *Green Forest*, 921 F.2d at 1403–04 (dismissing citizen suit's CWA claims which overlapped with a Government consent decree)). Under Section 1365(b)(1)(B), private litigation may not proceed if the EPA or a state is diligently prosecuting a civil action "about the same matter the private litigant wants to raise." *United States v. Metro. Water Reclamation Dist. of Greater Chicago* ("*MWRD*"), 792 F.3d 821, 824 (7th Cir. 2015). But when a citizen-plaintiff alleges violations which fall outside the scope of the government's suit, those claims are not barred. *See Frilling*, 924 F.Supp. at 836; *Ohio Valley Envtl.*

*Coal. v. Bluestone Coal Corp.*, No. CV 1:19-00576, 2020 WL 2949782, at **6–7 (S.D. W. Va. June 3, 2020).

Plaintiff's complaint asserts nine causes of action alleging violations of the County's NPDES Permit. The Ohio EPA's complaint in the State Action appeared to be more limited in scope. It asserted five claims, three of which concerned the County's obligation to submit a map and list of HSTSs. This apparent difference in the scopes of the two suits prompted the Court to deny the diligent prosecution prong of the County's motion to dismiss, except as it related to plaintiff's claims concerning the map and list (Counts Four and Six).

Now at summary judgment, however, the Court concludes that more of plaintiff's claims – specifically, Counts One, Two, Three, Seven, portions of Eight, and Nine – are precluded by the diligent prosecution bar. The Court's conclusion is based on the scope of the state court's Consent Order, which contains provisions and language broader in nature than what the complaint in the State Action might have indicated would be at issue.[3]

Before comparing plaintiff's claims to the scope of the Consent Order, the Court finds as a threshold matter that the Consent Order should be considered in determining whether plaintiff's claims are barred under Section 1365(b)(1)(B). Plaintiff argues that the proper approach is for a court to compare the citizen's complaint with only the state's complaint. To be sure, such an analysis is the natural starting point and a court often has no reason to proceed further, either because the two complaints plainly overlap or because a consent decree has not been entered into in the state action. *See Connecticut Fund For Env't v. Cont. Plating Co.*, 631 F.Supp. 1291, 1293 (D. Conn. 1986) ("In most cases, the court may rely primarily on a comparison of the pleadings filed in the two actions to determine whether the state and the citizen plaintiffs seek to require compliance with the [same] standard, order or limitation.") (quotation marks omitted). But neither the statute nor the case law prohibits consideration of a consent decree entered in a governmental action.

In light of Congress's clear directive that citizen suits may proceed only in the absence of comparable governmental action, this Court concludes that a court should take a consent decree into account in determining exactly what action the government is taking or has taken. As the

---

[3] In fairness to the Ohio EPA, the complaint in the State Action did make reference to certain standards which later came into play in the Consent Order. For instance, the complaint alleged that the NPDES Permit authorized the County to discharge only storm water to the MS4 and that the Permit required the County to detect and eliminate illicit discharges. *See* Doc. 3-2, ¶¶ 28, 29, 38. But the complaint did not expressly assert separate counts alleging that the County was violating those standards.

Seventh Circuit held, Section 1365(b)(1)(B) not only precludes a citizen suit when a comparable EPA or state action is currently being diligently prosecuted, but the provision "also means that the resolution (including a settlement) of a federal or state suit is binding on a private litigant whose suit was filed after the state or federal government's, if the state or federal action was diligently prosecuted." *MWRD*, 792 F.3d at 824 (citing *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 757–65 (7th Cir. 2004); *Louisiana Envtl. Action Network v. Baton Rouge*, 677 F.3d 737, 749–50 (5th Cir. 2012); *Piney Run Preservation Ass'n v. Carroll Cnty.*, 523 F.3d 453, 459–60 (4th Cir. 2008)). Therefore, when a consent decree exists, courts must examine them in determining whether a citizen suit seeks to require compliance with the same standard, limitation, or order at issue in the governmental action. *See, e.g.*, *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 129–30 (3d Cir. 2016); *Piney Run*, 523 F.3d at 460; *MWRD*, 792 F.3d at 825–27; *Karr*, 475 F.3d at 1197–98; *DeKalb Cnty.*, 484 F.Supp.3d at 1366; *Frilling*, 924 F.Supp. at 837.

### a.    Counts One, Two and Three

The first three counts of plaintiff's complaint go hand-in-hand. Count One alleges that the County has failed to trace, locate, and eliminate sources of non-storm water discharged from outfalls. Count Two alleges that the County has failed to eliminate known illicit discharges[4] to the MS4. Count Three alleges that the County has allowed illicit discharges of non-storm water to the MS4.

Plaintiff cites certain provisions of the Permit as being at issue with respect to each of these Counts. For Count One plaintiff cites Part III.B.3.i.iv, which requires that the IDDE component of the County's SWMP include a "plan to detect and address illicit discharges," including "failing" HSTSs which flow to the MS4. For Count Two plaintiff cites Parts III.B.3.a and III.B.3.e, both of which are among the provisions relating to the IDDE component and which provide that the County shall develop and implement a plan to "detect and eliminate" illicit discharges to the MS4. For Count Three plaintiff cites Parts I.B.2, I.B.3, and I.C, which provide that the County may not discharge non-storm water into the MS4, unless the Permit allows otherwise.

---

[4] The terms "illicit discharges" and "non-storm water discharges" are related. An illicit discharge is one not authorized by the NPDES Permit. *See* NPDES Permit, Part VI. The Permit authorizes storm water discharges and certain non-storm water discharges that are not relevant here. *Id.*, Part I.B.3. So for purposes of this case when plaintiff speaks of a non-storm water discharge, it is an illicit one. *See* Doc. 16 at PAGEID 492 n.11. In particular, plaintiff is referring to discharges from HSTSs containing some amount of sewage.

According to plaintiff, Counts One, Two, and Three rest on the assertion that there are over 2,000 HSTSs which were installed in the County prior to 2007 and have been illicitly discharging to the MS4. *See* Doc. 72 at PAGEID 3559, 3562–63, 3569, 3584–85, 3591. In plaintiff's view, so long as these treatment systems remain, the County will be violating the Permit. The basis for this view is not entirely clear from the record, but plaintiff's statements and citations to the record suggest that a new general permit requirement was imposed in 2007 in Ohio on the installation of HSTSs. *See* Robinson Dep. at 44–45; Ralph Aff. (Doc. 44-1), ¶ 12. Plaintiff claims that many pre-2007 HSTSs were aerator-type, Doc. 16 at PAGEID 482, and that the pre-2007 systems discharge some amount of sewage to the MS4 even if working properly. *Id.* at PAGEID 484 n.7 (claiming that pre-2007 systems are "incapable" of meeting water quality discharge standards); *see also* McAvoy Report (Doc. 66-1) at 6–7.

The crux of plaintiff's claims then is that there are over 2,000 pre-2007 HSTSs connected to discharge to the MS4 and that the County has failed to trace, locate, and eliminate them. The very fact of their existence means, in plaintiff's view, that the County has violated the Permit's various requirements for the County to have a plan to detect and eliminate non-storm water discharges.

The Court finds that the Consent Order contains provisions which require compliance with the same standards at issue in Counts One, Two, and Three. The County is required under the Consent Order to submit within six months a "plan and schedule to identify and address *all* discharging and failing" HSTSs, "including those that Defendant does not have records for." Consent Order, ¶ 14(b) (emphasis added). The Consent Order might not use the terms "trace and locate" as plaintiff did in Count One, but the idea is the same – the County must affirmatively identify all HSTSs which discharge to the MS4. Under the Permit provisions to which plaintiff cites, the County must have a plan to detect "failing" HSTSs. NPDES Permit, Part III.B.3.i.iv. Because the Order covers "all" HSTSs and expressly includes "failing" ones within its purview, *see* Consent Order, ¶ 14(b), the Order necessarily captures in its scope the alleged illicitly-discharging HSTSs of which plaintiff complains. *Cf. Cmty. of Cambridge Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge*, 115 F.Supp.2d 550, 556 (D. Md. 2000) (holding that Consent Orders covered the same standard as citizen suit where use of the term "unauthorized discharges" in state action was broad enough to encompass citizen suit's concern with "dry weather discharges"). The Court further observes that the Consent Order requires the County to provide an updated map and list containing "all HSTSs discharging" to the MS4. Consent Order, ¶ 14(b). The Order thereby requires the County to locate and identify all HSTSs, including failing ones. *Id.*

Plaintiff alleges that the Permit prohibits non-storm water discharges and that the County must have a plan to "address" and "eliminate" illicit discharges to the MS4. The Consent Order requires compliance with the same standards. It requires elimination of all discharging and failing HSTSs through either connection to the sanitary sewer system, connection to a soil absorption field, or replacement. With respect to "all discharging and failing HSTSs" located in areas where sanitary sewers are available, the County must submit a plan and schedule within six months for connecting them to the sanitary sewer system. *Id.*, ¶ 14(c). In addition to those areas, the County must submit a plan and schedule within six months for determining which areas can be feasibly connected to sanitary sewers. *Id.*, ¶ 14(d). The County must include a schedule for "connecting all such areas to sanitary sewers." *Id.* The Consent Order identifies plaintiff's neighborhood as one such area and requires the County to submit an application within twelve months for installing a sanitary sewer to un-sewered residences in his neighborhood. *Id.* For residences with discharging and failing HSTSs which cannot be connected to a sanitary sewer, the County must submit a plan and schedule within six months to include them in the County's operation plan for elimination through the installation of a soil absorption system or through replacement. *Id.*, ¶ 14(e). Where those options are not available, the County's plan and schedule must include provisions for notifying property owners of their obligation to pursue coverage under the Ohio EPA's general permit to discharge contaminated wastewater from HSTSs. *Id.*, ¶ 14(e).

The Court thus finds that the Consent Order provides for the County's compliance with the Permit's standard that illicit discharges be eliminated, including ones from failing HSTSs. Plaintiff takes issue with the use of the term "failing" in the Consent Order, even though the NPDES Permit, which was issued by the Ohio EPA under a program approved by the U.S. EPA, uses that term specifically in connection with HSTSs. *See* NPDES Permit, Part III.B.3.i.iv. Plaintiff argues that the Consent Order does not actually require elimination of the 2,000 HSTSs making illicit discharges to the MS4. Plaintiff believes that all pre-2007 HSTSs, even if functioning properly and not "failing," make illicit discharges. *See* Doc. 72 at PAGEID 3562–63. The Court notes, however, that the Consent Order requires the County to submit a schedule for eliminating "all illicit connections" to the MS4 with each of its annual reports. Consent Order, ¶ 14(j). Thus, to the extent Paragraphs 14(b) to (e) do not already require the County to address and eliminate illicit discharges from HSTSs, Paragraph 14(j) does.

Accordingly, the Court finds that the State Action is one which requires compliance with the same standards raised by plaintiff in Counts One, Two, and Three of his citizen suit. Plaintiff's

argument that the Ohio EPA did not diligently prosecute those standards will be addressed separately in Part III.C.2 below.

### b.  Count Five

In Count Five plaintiff alleges that the County has violated the NPDES Permit's requirement that it "shall to the extent allowable under State or local law, effectively prohibit, though ordinance, or other regulatory mechanism, illicit discharges into your storm sewer system and implement appropriate enforcement procedures and actions."  NPDES Permit, Part III.B.3.d. Plaintiff alleges that regulatory measures adopted by the County do not effectively prohibit illicit discharges.  In particular, plaintiff alleges that the relevant ordinance, Franklin County Public Health Regulation 106 (Sewage Treatment Systems), does not contain a prohibition on illicit discharges to the MS4.

The complaint in the State Action does not make reference to the Permit's requirement that the County prohibit illicit discharges through local ordinances and enforcement procedures.  The Consent Order does not either, but the County argues that one of the Order's provisions indirectly relates to this requirement of the Permit.  That provision requires the County to remove the following language from Section 4.0 of its written IDDE Plan: "It is important to note that while various HSTS discharge effluent, these discharges may or may not be illicit discharges.  As a general rule of thumb, if the HSTS discharging effluent is operating as intended, the resulting discharge is NOT an illicit discharge.  These determinations are undertaken by FCPH [Franklin County Public Health]."  Consent Order, ¶ 14(f); IDDE Plan (Doc. 16-1), § 4.0.  According to the County, the Consent Order's removal of the above-quoted language from the IDDE Plan eliminates the discretion that FCPH once had, when issuing public nuisance citations, to determine that an illicit discharge is not occurring so long as an HSTS is "operating as intended."

The Court finds that the diligent prosecution bar does not preclude Count Five.  The Consent Order does not require a change to the ordinance that is the subject of Count Five.  Rather, it requires a change to the County's written IDDE Plan language and does not address the alleged deficiency in the ordinance at issue in Count Five.[5]

---

[5]  Much of the County's argument for why it is entitled to summary judgment on Count Five does not concern the diligent prosecution bar but is directed toward the merits of the claim.  *See* Doc. 73 at PAGEID 3706–07.  The Court will address the merits of Count Five in Part IV.A below.

### c. Count Seven

Plaintiff alleges in Count Seven that the County has violated the Permit's requirement that the County shall "reduce the discharge of pollutants from your small MS4 to the maximum extent practicable." NPDES Permit, Part III.A.1. As he did with Counts One, Two, and Three, plaintiff alleges that the County has failed to eliminate illicit discharges from HSTSs to the MS4. *See* Doc. 72 at PAGEID 3573 ("For over a decade, the County has admittedly failed (and continues to fail) to eliminate illicit discharges and has, instead, allowed (and will continue to allow) unpermitted discharge of sewage and other pollutants to waters across the County (as alleged in Cox Claims 1–3).").

Plaintiff observes that the Consent Order does not mention the phrase "maximum extent practicable." This is true, but the Court finds that the Consent Order nonetheless requires compliance with the same standard at issue in Count Seven. The Permit provision which plaintiff cites, Part III.A.1, states that the method by which the County is to reduce the discharge of pollutants to the maximum extent practicable is through the SWMP's minimum control measures, including the IDDE component. As reviewed above with respect to plaintiff's first three claims, the various provisions of Paragraphs 14 of the Consent Order relate directly to the IDDE component. In particular, Paragraphs 14(a) through (e) and (j) require the County to submit plans and schedules to identify, address and eliminate illicit discharges from HSTSs to the MS4. In this way, the Order requires compliance with the standard at issue in Count Seven, which is to reduce pollutants to the maximum extent practicable.

### d. Count Eight

In Count Eight plaintiff alleges that the County has violated the Permit because its written Storm Water Management Program (Doc. 16-13), lacks these 13 items:

1. a copy of the completed map of the MS4;

2. a requirement to update the map within one year whenever the system expands because of annexation or expansion of the urbanized area;

3. an address list and map of sewage treatment systems which discharge into the MS4;

4. a mechanism by which the address list and map are updated;

5. identifying the person responsible for performing updates;

6. a mechanism to track sources of illicit discharge not removed by the end of the reporting year and develop a site-specific source elimination plan;

7.      a maintenance schedule for maintaining publicly-owned permanent water quality practices;

8.      a description of the processes and timeframes for notifying property owners of long-term maintenance problems;

9.      a schedule for employee training;

10.     identifying the NPDES facility permit number or No Exposure Certification associated with each municipal facility subject to industrial storm water permitting;

11.     a copy of the Storm Water Pollution Prevention Plans for facilities with their own NPDES permits;

12.     a maintenance schedule for the MS4; and

13.     identifying pollution prevention practices for road kill management, mulch manufacturing, and water and power line repairs and maintenance.

*See* Compl. (Doc. 1), ¶ 107.

The Court finds that the first five items relate to standards which were at issue in the State Action. Though the Court, at the motion to dismiss stage, declined to dismiss Count Eight because plaintiff couched the alleged violations as "programmatic" and as being separate from those alleged in Counts Four and Six, the Court now agrees with the County's argument that there is no meaningful distinction between plaintiff's previously-dismissed claims and the first five items of Count Eight. Counts Four and Six alleged that the County was required under the Permit to submit a map and list. The Permit requires maps and a list, as well as updates, from the County, and these requirements are found in the SWMP component of the Permit. That is, the source of the map and list requirements is in the SWMP provisions of the Permit. Counts Four and Six and the first five items of Count Eight are referring to the same standards, with which the Consent Order requires compliance. *See* Consent Order, ¶¶ 14(a), (b).

Regarding items six and eight of Count Eight, the County argues that they too are addressed in the State Action. The Court agrees. In particular, Paragraph 14(j) of the Consent Order requires the County to submit, with each annual report, a list of illicit connections not yet eliminated and a schedule for eliminating them. Paragraphs 14(b) through (e), as discussed above, specify how the County will go about eliminating failing HSTSs and notifying affected property owners.

Items nine and eleven too are addressed in the Consent Order. Specifically, Paragraphs 14(h) and (i) require the County to develop an employee training program and to have certain facilities implement Storm Water Pollution Prevention Plans.

The remaining four items (seven, ten, twelve and thirteen) were not addressed in the State Action. The Court will discuss the County's other arguments for dismissing these aspects of Count Eight in Part IV.B below.

### e. Count Nine

Plaintiff alleges in Count Nine that the County has violated the Permit by not including two elements of required content in its IDDE Plan. First, plaintiff alleges that the County has not included provisions to trace, locate, and eliminate illicit discharges. Second, plaintiff alleges that the County has not provided for the investigation of sources of contamination identified during dry weather screenings.

With respect to the first element, the Court finds that the Consent Order requires compliance with the same standard. As was discussed above regarding Counts One, Two, Three and Seven, Paragraphs 14(b) through (e) and (j) require the County to identify and locate all discharging and failing HSTSs, to evaluate the feasibility of connecting those systems to the sanitary sewer system, and to notify property owners of the need for a separate permit when an HSTS cannot be eliminated through connection to a sanitary sewer or a soil absorption system or through replacement.

The second element allegedly lacking from the IDDE Plan concerns investigation of contaminations identified during dry weather screenings. The Permit provides that the IDDE Plan will include provisions for "investigating the source(s) of contamination in outfalls identified during [the] dry weather screening process." NPDES Permit, Part III.B.3.e.iii. When a contaminating source detected by a dry weather screening is an HSTS, the County must pursue the following plan of action to address the illicit discharge:

> resolving the non-functioning HSTS with connection to central sewers being preferred alternative, followed by replacing system with a soil absorption system that does not discharge and only allowing a replacement discharging HSTS when no other option is available. For HSTS discharges that cannot be eliminated through connection to central sewers or installation of soil absorption systems, the property owner must be notified of the requirement to pursue coverage under an appropriate Ohio EPA general NPDES.

*Id.*.

The Court finds that the second component is covered by the Consent Order. The Consent Order contains the following provision:

> Within six (6) months, Defendant shall submit to Ohio EPA for review and concurrence a plan and schedule to include the HSTSs not able to connect to sanitary sewers identified above in Paragraphs l4(b), l4(c) and l4(d) in Defendant's operation and maintenance program. For any replacement discharging HSTSs that cannot be eliminated through connection to sanitary sewers or installation of soil absorption systems, the plan and schedule shall require Defendant to notify the property owners of the requirement to pursue coverage under the Ohio EPA's General Permit to Discharge Wastewater from Household Sewage Treatment Systems under the National Pollutant Discharge Elimination System.

Consent Order, ¶ 14(e).

Even though the Consent Order does not mention investigation of contaminating sources, it requires the County to find and identify all HSTSs, including failing ones, discharging to the MS4. And it requires the same plan of elimination as the Permit requires when HSTSs are the contaminating source. That is, the Consent Order treats all discharging and failing HSTSs as contaminating sources and requires the County to first attempt to connect them to a central sewer, then to install a soil absorption system, then to replace, and finally, when the HSTS cannot be eliminated, to notify the property owner of the requirement to pursue coverage under an Ohio EPA general permit. Given that HSTSs are the only sources of contamination alleged by plaintiff, the Consent Order requires compliance with the same standard at issue in Count Nine. *See Appalachian Voices v. Duke Energy Carolinas, LLC*, No. 1:17CV1097, 2018 WL 6984857, at *4 (M.D.N.C. Aug. 13, 2018) ("Citizen suits have also been barred when seeking to enforce specific permit conditions that fall within the scope of a broader agency enforcement action.") (citing *Cmty. of Cambridge*, 115 F.Supp.2d at 556).

### 2. Diligent Prosecution

The next step of the inquiry is to determine whether the government has diligently prosecuted the standards put at issue in the enforcement action. A "CWA enforcement action will be considered diligent where it is capable of requiring compliance with the Act and is in good faith calculated to do so." *Piney Run*, 523 F.3d at 459 (internal quotation marks omitted). Diligence "is presumed," *id.*, and the "burden for proving non-diligence is heavy," *Ohio Valley Envtl. Coalition, Inc. v. Maple Coal Co.*, 808 F.Supp.2d 868, 883 (S.D. W. Va. 2008); *accord Karr*, 475 F.3d at 1198. The presumption of the diligence of a governmental enforcement action "arises from a variety of policy considerations: deference to state (and federal) decision-making and enforcement authority,

protection of litigants' interest in the finality of their cases, preservation of the incentives that polluters might have to settle charges with state or federal authorities, and recognition of the limited and interstitial role that citizen suits occupy in the overall enforcement regime." *Citizens Legal Envtl. Action Network, Inc. v. Premium Standard Farms, Inc.*, No. 97-6073-CV-SJ-6, 2000 WL 220464, at *12 (W.D. Mo. Feb. 23, 2000) (citing cases). A citizen's "mere unhappiness with an enforcement action (or its settlement terms) does not authorize them to bring a separate lawsuit." *Id.* (citing cases).

The "deferential" stance toward state enforcement actions requires the citizen-plaintiff to "meet a high standard to demonstrate that [the government] has failed to prosecute a violation diligently." *Karr*, 475 F.3d at 1198. In meeting his burden, plaintiff must do more than show that the government's prosecutorial strategy fails to coincide with his strategy or is less aggressive than what he prefers. *See Tennessee Clean Water Network v. Tennessee Valley Auth.*, 206 F.Supp.3d 1280, 1293 (M.D. Tenn. 2016); *Maple Coal*, 808 F.Supp.2d at 884. As the Sixth Circuit has stated, "second-guessing of the EPA's assessment of an appropriate remedy . . . after the entry of [consent] decrees . . . fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has failed to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view." *Gallatin Steel*, 390 F.3d at 477 (internal quotation marks omitted).

To meet his burden, plaintiff must show that the government's action is incapable of requiring compliance with the applicable standards. *See Piney Run*, 523 F.3d at 459; *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 528–29 (5th Cir. 2008); *see also Connecticut Fund*, 631 F.Supp. at 1293 ("The court must presume the diligence of the state's prosecution of a defendant absent persuasive evidence that the state has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith."). "Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence." *Karr*, 475 F.3d at 1197.

### a. Procedural-Type Objections

Plaintiff offers many reasons for why he believes the State Action and Consent Order do not amount to diligent prosecution by the Ohio EPA. He first attacks what he considers to be the Ohio EPA's late response to the County's problem with HSTSs discharging to the MS4. He argues that it took the Ohio EPA over a decade to act and did so only after receiving plaintiff's Notice of Intent to Sue. He feels that it was unfair for the Ohio EPA to wait so long and then try to undermine his lawsuit.

This argument must be rejected. A citizen may bring suit only for present and continuing violations, *see Gwaltney*, 484 U.S. at 64, and Congress decided that a citizen may not file suit until he first gives notice to the regulatory authorities and they fail to prosecute an action. *See Gallatin Steel Co.*, 390 F.3d at 475; *Green Forest*, 921 F.2d at 1403 ("[C]itizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'") (internal quotation marks omitted). No matter how long an alleged violation has been going on, the CWA entrusts federal and state agencies with the prerogative to prosecute the violations alleged in a citizen notice letter. *See id.*; *see also* 33 U.S.C. § 1251 ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.").

Section 1365(b) represents an example of where "legislation may allocate litigation rights to an agency that represents the whole public." *MWRD*, 792 F.3d at 824 (citing *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); Restatement (Second) of Judgments § 41(1)(d)). Though plaintiff believes the time has come that he should be able to bring suit to correct long-standing problems with HSTSs in Franklin County, he has not set forth facts showing that the Ohio EPA acted in a dilatory manner in responding to his Notice letter or in prosecuting the State Action.[6] Section 1365(b) requires that the state have an opportunity to bring suit first, which the Ohio EPA did once plaintiff submitted his Notice letter. *See Gwaltney*, 484 U.S. at 59 ("If the Administrator or the State commences enforcement action within that 60-day period, the citizen suit is barred, presumably because governmental action has rendered it unnecessary.").

Plaintiff may feel as though the Ohio EPA undercut his intended citizen suit, but there is nothing unfair about this result given the primary enforcement role that Congress appointed to governmental agencies. "[A] private party is not supposed to be a full-fledged independent litigator, if the state or federal government diligently prosecutes a suit." *MWRD*, 792 F.3d at 825 (explaining that the citizen is meant to play the "more modest role" of intervenor, which carries important rights, including the ability to enforce a consent decree). *See also Hudson River Fishermen's Ass'n v.*

---

[6] Moreover, plaintiff's assertion that the Ohio EPA did nothing until receiving plaintiff's Notice letter is factually incorrect. As was reviewed in Part I.C above, the Ohio EPA sent a letter to the County regarding potential violations of the NPDES Permit in June 2017, a year before plaintiff's August 2018 Notice letter.

*Westchester Cnty.*, 686 F.Supp. 1044, 1051–52 (S.D.N.Y. 1988) ("The thrust of the CWA is to provide society with a remedy against polluters in the interest of protecting the environment. . . . If the Government's action achieves that end, the fact that HudFish or any other private attorney general is barred from duplicating that effort should hardly seem surprising or harsh. The Government, of course, as representative of society as a whole, usually is in the best position to vindicate societal rights and interests.").

Plaintiff next emphasizes that the County, upon learning of his Notice letter, welcomed legal action from the state and quickly worked out a proposed consent order with the Ohio EPA. While it is true that the County communicated to the Ohio EPA that they would rather resolve the issues raised in the Notice by dealing with the Ohio EPA than to defend against a citizen suit, *see* Doc. 72-2, plaintiff has not demonstrated collusive conduct by the County and Ohio EPA. As the Fourth Circuit held in *Piney Run*: "Even assuming that the County requested MDE [Maryland Department of the Environment] to pursue the enforcement action, 'there is no incompatibility whatever between a defendant's facilitation of suit and the State's diligent prosecution – as prosecutions of felons who confess their crimes and turn themselves in regularly demonstrate.'" 523 F.3d at 460 (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 211 n.4 (Scalia, J., dissenting)).

The Notice letter accomplished what it supposed to – it gave the Ohio EPA a chance to bring suit and prompted the County, the alleged violator, to offer to bring itself into compliance with the NPDES Permit. *See Atlantic States Legal Foundation, Inc. v. United Musical Instruments*, 61 F.3d 473, 478 (6th Cir. 1995) ("One of the important purposes of the notice requirement under environmental statutes is to facilitate dispute resolution by EPA negotiation [and thereby] reduce the volume of costly litigation.") (internal quotation marks omitted); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F.Supp.3d 428, 435 (M.D.N.C. 2015) ("The notice requirement provides the opportunity for the government to initiate its own enforcement action against the alleged violator and for the alleged violator 'to bring itself into complete compliance with the Act,' both obviating the need for a citizen suit.") (quoting *Gwaltney*, 484 U.S. at 59–60). If a citizen plaintiff could litigate claims which cover the same matter as a consent order, "the government's ability to reach voluntary settlements with defendants would be severely undermined, as defendants would have little incentive to settle disputes with the government." *Bluestone Coal*, 2020 WL 2949782, at *6 (citing *Piney Run*, 523 F.3d at 459, *MWRD*, 792 F.3d at 824–25).

### b. Vagueness

Plaintiff contends that the Consent Order does not represent a diligently-prosecuted action because it is vague. And because the Consent Order is vague, plaintiff argues, it does not force the County to actually comply with the standards of the NPDES Permit. Plaintiff in particular emphasizes that the Consent Order does not define the terms "illicit discharge" and "eliminate." In plaintiff's view, the Consent Order's vague language enables the County to continue to avoid eliminating pre-2007 HSTSs, which make illicit discharges to the MS4.

The Court must reject plaintiff's vagueness argument. The Consent Order should not be viewed in isolation from the County's NPDES Permit, the source of the standards on which the Consent Order is based. *See* Consent Order, ¶ 13; *cf. Friends of Milwaukee's Rivers*, 382 F.3d at 760–61 (reading the consent order in conjunction with the permit and statutory regime). It is true that the Consent Order does not define "illicit discharge," but the Permit does and it says that an illicit discharge is any discharge to the MS4 "that is not entirely composed of storm water." NPDES Permit, Part VI. Moreover, the term "illicit discharge" is defined in 40 C.F.R. § 122.26(b)(2), and the Permit's definition not only cites that regulation but follows its definition exactly.

The Consent Order also does not define the term "eliminate," but if there is a vagueness concern with that term, the Consent Order is not the source of the problem. The Order tracks the language of the Permit and requires the County to "comply fully" with the Permit. Consent Order, ¶ 13. The Permit does not expressly define "eliminate," but it does establish a process for how illicitly-discharging HSTSs are to be eliminated. First, a municipality is to aim to develop a plan to connect homes with HSTSs to a sanitary sewer system, when feasible. NPDES Permit, Part III.B.3.e. The next alternative is to install a soil absorption system and then to replace the HSTS. *Id.* If elimination cannot be accomplished by those means, the municipality must notify the property owner of the requirement to pursue coverage under a separate NPDES permit. *Id.* The Consent Order requires compliance with this same protocol for elimination. Consent Order, ¶ 14(e). The Permit further requires the County to maintain a list of all illicit connections to the MS4 that have not been eliminated and to provide a schedule for their elimination. NPDES Permit, Part III.B.3.k(5). The Consent Order contains this same mandate. Consent Order, ¶ 14(j).

Thus, it is not a matter of whether illicit discharges should be brought to an end – that they are called "illicit" signals that they should be. *See* 33 U.S.C. § 1342(p)(3)(B)(ii) (a permit should require the permit holder "to effectively prohibit non-stormwater discharges into the storm sewers"). It is a matter of how and when elimination will occur. *See id.* at § 1342(p)(3)(B)(iii) ("to

the maximum extent practicable"). The Permit, which was issued under a general state permit available to municipalities all over Ohio, recognizes that solutions must be flexible and situation-dependent. The Permit does not impose strict timeframes. It requires the permit holder to develop a plan to reduce illicit discharges "to the maximum extent practicable" and to adopt "best management practices," with goals which are allowed to be measured in years. NPDES Permit, Part III.A.1; *see also id.*, Part III.A.2 (providing for periods of multiple years for a permit holder to comply with certain obligations); 40 C.F.R. § 122.34(a) (allowing permit holders to adopt best management practices and schedules for implementation to reduce the discharge of pollutant to the maximum extent practicable).

The Permit's IDDE provisions, including those which are specific to HSTSs, likewise do not impose hard-and-fast deadlines. They instead require the permit holder to develop plans and programs designed to "address" illicit discharges to the MS4 and have as their ultimate goal the eventual elimination of illicit discharges. NPDES Permit, Part III.B.3. The Permit recognizes that certain measures, like connection to a sanitary sewer system, will not always be feasible or economical and that efforts towards eliminating illicit discharges will require the permit holder to coordinate with other entities, such as local boards of health, planning agencies, and waste water authorities. *Id.*, Part III.B.3.e; *see also* 40 C.F.R. § 122.34(b)(3)(i)(C) (requiring permit holders to have a plan to "address" non-storm water discharges).

The Consent Order uses the word "eliminate" in the same way the Permit does – as in, to remove. *See* Oxford English Dictionary, *Eliminate* (3d ed. 2018). Given the Permit's somewhat malleable standards for how the County is to go about addressing and eliminating illicit discharges, the Court finds that the Consent Order is not so vague as to be the product of non-diligent prosecution.

### c. Deadlines

Relatedly, plaintiff argues that the Consent Order lacks meaningful deadlines or enforcement schedules. Plaintiff contends that a diligently-prosecuted Consent Order would have contained specific benchmarks for the elimination of HSTSs, such as 200 units eliminated per year. *See* Doc. 72 at PAGEID 3582.

This argument fails as well. It is true that the Consent Order does not set forth dates by which certain numbers of discharging HSTSs must be eliminated. However, the Order does impose specific time frames by which the County must take certain actions and submit plans and schedules. For instance, the County had six months to submit a plan and schedule for identifying and

addressing all discharging and failing HSTSs. Consent Order, ¶ 14(b). The County had six months to submit a plan and schedule for evaluating areas served by sanitary sewers and for connecting HSTSs in those areas to sanitary sewers. *Id.*, ¶ 14(c). And the County had twelve months to submit an application to install a sanitary sewer in plaintiff's neighborhood. *Id.*, ¶ 14(d).

That the Consent Order affords the flexibility of a prospective schedule for eliminating illicit discharges, rather than establishing a "final deadline" for total elimination, "does not necessarily establish lack of diligence." *Piney Run*, 523 F.3d at 459–60. "Indeed, when presented with a consent decree [courts] must be particularly deferential to the agency's expertise, and [they] 'should not interpret § 1365 in a manner that would undermine the [government's] ability to reach voluntary settlements with defendants.'" *Id.* (quoting *Karr*, 475 F.3d at 1198). The Consent Order sets timelines of anywhere from thirty days to twelve months for the County to bring itself into compliance. *Id.*, ¶ 14(a)–(l). *Cf. Friends of Milwaukee's Rivers*, 382 F.3d at 760–61 (finding that a timeframe of eight years to make sewer improvements was "not so lengthy as to indicate a lack of diligence"). It enforces the Permit by requiring the County to submit HSTS-specific plans and schedules that the Ohio EPA reviews within thirty days and either approves or requires the County to revise in order to remedy any deficiencies. Consent Order, ¶ 14(k).

Plaintiff's argument that a diligent prosecution would have resulted in more stringent terms, like the elimination of 200 HSTS units per year, is unavailing. *See Green Forest*, 921 F.2d at 1404. The presumption of diligent prosecution recognizes that "courts are not in the business of designing, constructing or maintaining sewage treatment systems." *Friends of Milwaukee's Rivers*, 382 F.3d at 760. The presumption cannot be overcome "by showing that the agency's prosecution strategy is less aggressive than [plaintiff] would like or that it did not produce a completely satisfactory result." *Piney Run*, 523 F.3d at 459. The CWA "does not require government prosecution to be far-reaching or zealous," *Karr,* 475 F.3d at 1197, nor is a citizen entitled to seek some form of "personalized remedy" that the government declined to pursue in its action against the violator. *Hudson River*, 686 F.Supp. at 1052.

Even though plaintiff desires to have a set number of HSTSs to be eliminated per year, it must be noted that the Ohio EPA obtained a remedy in the Consent Order which delivers substantial personal relief to plaintiff and substantial relief to other residents on whose behalf plaintiff seeks to bring his citizen suit. As discussed above, the Order provides for the elimination of failing HSTSs in areas already served by sanitary sewers. It further requires the County to submit a plan to determine which other areas can be feasibly connected to sanitary sewers and to include a

schedule for connecting those areas to sanitary sewers. The Order provides in particular for the County to install a sanitary sewer system in the neighborhood where plaintiff lives. The primary example of harm alleged in plaintiff's complaint was that he and his family were being subjected to noxious sewer odors emitted from curb inlets near their residence, curtailing their ability to walk and bike in the neighborhood and diminishing their use and enjoyment of their yard and patio. Compl., ¶¶ 67–71. The Consent Order directly resolves the harm most immediately felt by plaintiff.

The Consent Order, having placed a priority on eliminating illicit discharges in plaintiff's neighborhood, provided a modest time cushion of six months for the County to submit plans and schedules for addressing other areas within the MS4. Again, the absence of a strict, final deadline for elimination of all illicitly-discharging HSTSs does not make the Ohio EPA's prosecution non-diligent. *See Piney Run*, 523 F.3d at 461 ("[T]he Association's complaint about the absence of a final compliance deadline in the Consent Judgment is unavailing."). The Ohio EPA must be afforded the latitude to establish priorities and to make concessions in its dealings with the County. *See* 40 C.F.R. § 122.34(b)(3)(iii) (recommending that permitting authorities require permit holders to identify "priority areas"); *N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 558 (1st Cir. 1991) ("Merely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief."); *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) ("An Administrator unable to make concessions is unable to obtain them. A private plaintiff waiting in the wings then is the captain of the litigation."); *DeKalb Cnty.*, 484 F.Supp.3d at 1370–71 ("The absence of a strict timeline for DeKalb to remediate . . . non-priority areas seems to be another concession made by the government to reach the totality of the Consent Decree, which the Court must respect."); *Cmty. of Cambridge*, 115 F.Supp.2d at 555.

### d.    Penalty

Plaintiff next attacks the Consent Order's penalty provision. He argues that the $10,000 penalty imposed on the County is deficient because it does not make up for the alleged decade-long period of non-compliance.

Here too the Court must defer to the judgment of the Ohio EPA, which is attempting to balance considerations of punishment for past violations, future deterrence, and directing the violator's available resources toward remedying the problem. *See Friends of Milwaukee's Rivers*, 382 F.3d at 762 (rejecting the argument that "diligence requires penalties" and stating that the state may instead choose to secure expensive capital improvements by the violator). Deference is particularly

appropriate since the Ohio EPA exacted a penalty exceeding the amount its own internal analysis determined would be appropriate, in light of the severity of the violations, potential for harm to the public, and acceptance of responsibility by the County.  *See* Reeder Dep. (Doc. 39-1) at 25, 28–29; Doc. 71-4 (calculating the appropriate penalty to be $8,725).  The Consent Order also imposes an escalating penalty structure should the County fail to comply with its obligations under the Order.  *See* Consent Order, ¶ 18 (providing for fines up to $1,000 per day).

In addition to imposing a penalty, the Consent Order focuses the County's attention and resources on addressing the problem of illicitly-discharging HSTSs.  Again, it requires the County to fix plaintiff's neighborhood, as well as to identify and schedule other areas for connection to the sanitary sewer system.  The Ohio EPA's approach in balancing the need for a penalty with the need to direct the County's resources toward fixing the problem must be respected.  *See Gwaltney*, 484 U.S. at 60–61; *Scituate*, 949 F.2d at 556; *Piney Run*, 523 F.3d at 460–61 (". . . MDE's agreement to accept a lower daily fine in the Consent Judgment appears to be nothing more than a concession on the part of MDE in exchange for other obligations . . . that are imposed on the County.  As we have noted, this is precisely the type of discretionary matter to which we should defer."); *Cmty. of Cambridge*, 115 F.Supp.2d 550, 556–57 ("MDE's discretionary decision not to impose significant monetary penalties on the City does not support a finding of lack of diligence.  The City is bearing other substantial costs of the sewer and storm drain project, and MDE has reserved the right to assess penalties in the future if necessary.").

### e.     Effectiveness

Finally, plaintiff contends that the Consent Order will not be effective in eliminating illicit discharges.  He believes the County will be able to continue to violate its Permit and continue its practice of allowing homeowners to operate illicitly-discharging HSTSs.  In particular, he argues that the County will to continue to allow pre-2007 HSTSs to exist and will require only that they be repaired when failing rather than require them to be eliminated altogether.

In reviewing an argument that a consent decree "just won't work," the Seventh Circuit examined whether the consent decree was a "reasonable settlement likely to bring about compliance."  *MWRD*, 792 F.3d at 825–27.  The Seventh Circuit rejected the proposition that a consent decree is not the product of diligent prosecution "if there is a chance that the consent decree will fail to achieve full compliance with the Act and all permits."  *Id.* at 825.  "Even the most diligent litigator may conclude that settlement is the best option – if only because it frees up enforcement resources for use elsewhere – and to achieve a settlement a litigant must accept

something less than the most favorable outcome." *Id.  See also Karr*, 475 F.3d at 1197 ("Particularly when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment can undermine agency strategy.  If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees.")

The Court finds, for purposes of the diligent prosecution inquiry, that the Consent Order is reasonable and likely to bring about compliance.  Even the Permit itself does not demand the type of full and immediate compliance plaintiff argues that a diligent prosecution would achieve.  The practical reality is that illicit discharges to the MS4 have been and will be made.  That alone does not make the Consent Order the product of a non-diligent prosecution.  *See MWRD*, 792 F.3d at 825; *Piney Run*, 523 F.3d at 460 (rejecting argument that prosecution is not diligent if it "fail[s] to ensure that violations would not continue"); *Karr*, 475 F.3d at 1197 ("[A]n unsatisfactory result does not necessarily imply lack of diligence."); *Scituate*, 949 F.2d at 558 ("[V]iolations may continue despite everything reasonably possible being done by the State . . . to correct them.").

The relevant inquiry is not whether there will never again be an illicit discharge made to the MS4 but whether the Consent Order represents a solution calculated in good faith to address the problem raised by plaintiff.  *See Piney Run*, 523 F.3d at 460; *see also MWRD*, 792 F.3d at 827 ("That the settlement of a given case takes the world as it exists, however, does not show a lack of diligent prosecution or a substantively unreasonable outcome.").  Plaintiff alleges that a problem exists with HSTSs making illicit discharges to the MS4 and that the problem is acute in his neighborhood.  The Consent Order recognizes that a problem exists in plaintiff's neighborhood and provides a direct remedy.  It also requires the County to identify all discharging and failing HSTSs in the system and to produce a plan and schedule for their elimination, using the same protocol for elimination as the Permit provides.  In the Court's view, the Consent Order is reasonably calculated to address the source of the violations alleged by plaintiff.  *See Friends of Milwaukee's Rivers*, 382 F.3d at 760 ("[T]he focus of the diligent prosecution inquiry should be on whether the actions are calculated to eliminate the cause(s) of the violations."); *Scituate*, 949 F.2d at 557 ("Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored.").

Plaintiff protests that the County will be able to get away with allowing repairs to be made to pre-2007 HSTSs.  This argument is belied by plaintiff's concession that the Ohio EPA's position on the issue is the same as his own:  "The Ohio EPA has repeatedly made clear that such [pre-2007] HSTSs are illicit, and the County is required by its permit to eliminate them from the system. . . .

This is the precise position Mr. Cox has taken in this case. Hence, Ohio EPA's interpretation of its permit supports Plaintiff's position." Doc. 72 at PAGEID 3590. The Ohio EPA obtained a Consent Order requiring the County's full compliance with the Permit, elimination of HSTSs in plaintiff's neighborhood, a plan for eliminating failing HSTSs elsewhere, and a schedule for the elimination of all illicit connections to the MS4. Consent Order, ¶¶ 13, 14(a)–(e), 14(j).

To the extent plaintiff fears that the Ohio EPA, despite the position it has taken, will let the County allow repairs to be made to older HSTSs, this Court emphasizes that the Consent Order was issued by the state court. Though the diligent prosecution inquiry authorizes this Court to go as far as determine whether the Consent Order represents a reasonable, good faith solution to the violations alleged by plaintiff, it is not the Court's role to address whether conduct which plaintiff fears will take place would amount to a breach of the Consent Order. *See* Consent Order, ¶ 28 (retention of jurisdiction in the state court to enforce the Consent Order); *DeKalb Cnty.*, 484 F.Supp.3d at 1371–72 (finding that the correct forum for hearing claims of non-compliance with a consent decree was in the court where the decree was issued).

Other concerns raised by plaintiff fare no better. He anticipates that certain provisions of the Consent Order will be narrowly construed by the County to apply variously to only "newly listed HSTSs," to "areas sewered prior to 2003," and to "owners of pre-1970s systems." Doc. 72 at PAGEID 3584, 3587–88 (emphasis omitted). The Consent Order itself makes no such distinctions and plaintiff has provided no basis for why he believes the Consent Order will be limited in such a fashion. *Cf. Bluestone Coal*, 2020 WL 2949782, at *6 ("Essentially, a plaintiff must provide a set of facts demonstrating that the defendant will continue to engage in violations that were not satisfactorily addressed by a consent decree."). Again, it is not for this Court to resolve alleged breaches of the Consent Order, much less hypothetical scenarios.

If the concerns anticipated by plaintiff come to pass, plaintiff is not without help or remedy. The Ohio EPA – which not only filed suit after receiving plaintiff's Notice letter and obtained the Consent Order, but which also agrees with plaintiff's position on what constitutes elimination of illicit discharges – can attempt to resolve the matter with the County and ultimately move the state court to enforce the Consent Order. *See Friends of Milwaukee's Rivers*, 382 F.3d at 762 (noting that if compliance issues arise with the settlement, "the State and [municipal sewage authority] are entitled by the Act to an opportunity to resolve them before the plaintiffs may jump into the fray").

Were the Ohio EPA to fail to pursue further action on its own initiative, plaintiff could petition the Ohio EPA to move to enforce the Consent Order and he could seek leave to intervene

and petition the state court himself to enforce the Consent Order.[7]  He could also submit a new Notice of Intent to Sue.  *Cf. Gallatin Steel*, 390 F.3d at 477 (noting that, where the U.S. EPA had reached consent decrees with a violator in federal court, the citizen plaintiff had three avenues of relief: petition the EPA to enforce the consent decrees, petition the EPA or the court to modify the consent decrees, or submit a new notice letter); *DP Marina, LLC v. City of Chattanooga*, 41 F.Supp.3d 682, 694 (E.D. Tenn. 2014) (alleged post-decree violations could not be pursued in pre-existing citizen suit).

### D.  Summary

In sum, the Court finds that the diligent prosecution bar precludes Counts One, Two, Three, Seven, portions of Eight (items 1, 2, 3, 4, 5, 6, 8, 9, and 11), and Nine.  In those Counts plaintiff alleges that the County has violated its Permit by failing to eliminate illicit discharges from HSTSs to the MS4.  The scope of the Consent Order covers the matter.  Specifically, the Order imposes six- to twelve-month deadlines in which the County must submit plans and schedules for the elimination of illicitly-discharging HSTSs.

Plaintiff has not met his heavy burden of showing that the Ohio EPA has failed to diligently prosecute the alleged violations.  He has not demonstrated that the Ohio EPA has been "unwilling to act" or has failed to exercise its enforcement responsibility.  *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1252 (11th Cir. 2003); *see also Gallatin Steel*, 390 F.3d at 475.  Nor has he shown that the Consent Order is an unreasonable solution, not calculated in good faith to bring the County into compliance with the Permit.  The County is therefore entitled to summary judgment on these claims.

## IV.  Cross-Motions for Summary Judgment Regarding the Remaining Claims

### A.  Count Five

Plaintiff alleges that the County has violated the Permit's requirement that the County "shall to the extent allowable under State or local law, effectively prohibit, though ordinance, or other regulatory mechanism, illicit discharges into your storm sewer system and implement appropriate enforcement procedures and actions."  NPDES Permit, Part III.B.3.d.  Plaintiff argues that the relevant local ordinance, Franklin County Public Health Regulation 106 (Sewage Treatment Systems), fails to require that illicit discharges be eliminated.  Specifically, plaintiff alleges that the local board of health, FCPH, unlawfully allows owners of pre-2007 HSTSs to repair their systems

---

[7]  As noted above, plaintiff chose not to move to intervene earlier in the State Action, even though it would have been uncontested.  He did receive a grant of leave to file an *amicus curiae* brief opposing the Consent Order.

rather than require that they be eliminated through connection to a sanitary sewer or soil absorption system or through replacement with a newer HSTS.

The phrase "to the extent allowable under State or local law" plays a key role in the Court's analysis. The Ohio Revised Code contains a chapter on household and small flow on-site sewage treatment systems. O.R.C. §§ 3718.01–3718.99. Its definition of a "household sewage treatment system" includes the type of HSTSs at issue in this case, namely systems receiving and treating sewage from single-family or multi-family dwellings. O.R.C. § 3718.01(F); *see also* O.A.C. § 3701-29-01(WW); NPDES Permit, Part VI.

Ohio law requires that public boards of health allow older sewage treatment systems to be repaired. HSTSs in operation "prior to the effective date of this section [September 17, 2010] shall not be required to be replaced with a new sewage treatment system under this chapter or rules adopted under it and shall be deemed approved if the system does not cause a public health nuisance or, if the system is causing a public health nuisance as provided in section 3718.011 of the Revised Code, repairs are made to the system that eliminate the public health nuisance as determined by the applicable board of health." O.R.C. § 3718.012.

The same chapter of the Ohio Revised Code requires that the Director of Health enact regulations requiring local boards of health to exercise oversight over HSTSs. O.R.C. § 3718.02. Further, the Director is to enact standards for the design, installation, operation, monitoring, and maintenance of HSTSs and "for the progressive or incremental alteration or repair of an existing sewage treatment system." *Id.*, § 3718.02(A)(3). "The rules shall be adopted so as to establish *a preference for the repair of an existing sewage treatment system*, when technically and economically feasible, rather than its replacement with a new system." *Id.* (emphasis added).

Consistent with the Revised Code, the Ohio Administrative Code provides that local boards of health must permit repairs to be made to HSTSs installed prior to September 2010:

> In accordance with section 3718.012 of the Revised Code, a sewage treatment system that was in operation prior to the effective date of these rules shall not be required to be replaced with a new sewage treatment system, and shall be deemed approved if the system does not cause a public health nuisance, or if the system is causing a public health nuisance as provided in section 3718.011 of the Revised Code, repairs are made to the system that eliminate the public health nuisance as determined by the applicable board of health. Repairs must be completed in accordance with the requirements of this chapter.

O.A.C. 3701-29-02(C).

The County's SWMP provides that FCPH has the authority to regulate sewage treatment systems under Ohio Revised Code Chapter 3718, Ohio Administrative Code 3701-29, and Franklin County Public Health Regulation 106. *See* SWMP (Doc. 16-13) at p. 29. Public Health Regulation 106 in turn provides authorizes FCPH to "enforce Ohio Administrative Code 3701-29." Doc. 4-4 at PAGEID 257.

Plaintiff argues that Regulation 106 is deficient because it does not prohibit all illicit discharges and because FCPH in practice has allowed owners of pre-2007 HSTSs to repair their systems. *See* Affidavit of Nathan Ralph, ¶ 7 (Doc. 44-1); FCPH Abatement Flow Chart (Doc. 16-1 at PAGEID 555). However, the Permit provides that the County will enact ordinances or other regulatory mechanisms to prohibit illicit discharges only to the extent allowable under state law. State law provides that FCPH, in enforcing public nuisance regulations, must allow HSTSs put into operation before September 17, 2010 to be repaired. O.R.C. § 3718.012; O.R.C. § 3718.02(A)(3); O.A.C. 3701-29-02(C).

The true object of plaintiff's complaint about FCPH allowing pre-2007 HSTSs to be repaired is Ohio law on the matter. Ohio law requires FCPH to allow older HSTSs to be repaired, while the County's Permit provides that the County will develop and implement a plan to eliminate illicit discharges. Plaintiff argues that these two standards are incompatible with each other, but his argument is beyond the purview of this lawsuit. Plaintiff has not named the state as a defendant, nor has he asserted a claim that Ohio's law is trumped by the CWA.

Accordingly, the Court finds that the County is entitled to summary judgment on Count Five.

## B. Count Eight

In Part III.C.1.d above, the Court found that items seven, ten, twelve and thirteen of Count Eight are not precluded by the diligent prosecution bar. According to the complaint, the Permit requires that the County include the following in its SWMP:

7.    a maintenance schedule for maintaining publicly-owned permanent water quality practices;

10.    identifying the NPDES facility permit number or No Exposure Certification associated with each municipal facility subject to industrial storm water permitting;

12.    a maintenance schedule for the MS4; and

13.    identifying pollution prevention practices for road kill management, mulch manufacturing, and water and power line repairs and maintenance.

Compl., ¶ 107.

The Court finds that items seven and thirteen are not standards which are enforceable by plaintiff in a citizen suit. Under the CWA, a citizen may bring suit against any governmental agency alleged to be in violation of "an effluent standard or limitation." 33 U.S.C. § 1365(a)(1). An effluent standard or limitation is defined to include "a permit or condition of a permit." *Id.*, § 1365(f)(7). As the County notes, the Permit does not require the County to have a maintenance schedule for maintaining publicly-owned permanent water quality practices, nor does it require the County to identify pollution prevention practices for road kill management, mulch manufacturing, and water and power line repairs and maintenance. The source of items seven and thirteen is the Ohio EPA's June 2017 letter to the County in which it was "recommended" that the County include such a maintenance schedule and pollution prevention practices in its SWMP. Doc. 15-3 at PAGEID 447. Because the Permit itself does not require these items, the Court finds that the County is entitled to summary judgment on items seven and thirteen of Count Eight.

Turning to items ten and twelve, the Court finds that the Permit does contain standards which touch upon these matters. With respect to item ten, the Permit requires that the County's SWMP contain a "pollution prevention/good housekeeping program for municipal operations." NPDES Permit, Part III.B.6. One aspect of the program calls for the County to submit "a list of industrial facilities" owned or operated by the County and "that are subject to Ohio [EPA's] Industrial Storm Water General Permit or individual NPDES permits for discharges of storm water associated with industrial activity that ultimately discharge to [the] MS4." *Id.*, Part III.B.6.c. The list must "[i]nclude the Ohio permit number or a copy of the Industrial [Notice of Intent] form for each facility." *Id.*

The County's SWMP does not contain a list of the County's industrial facilities which are subject to industrial storm water permits or the permit numbers or forms associated with those facilities. *See* SWMP at pp. 50-53 (listing the facilities for which the County is not required to obtain an industrial storm water permit, but not listing the facilities, if any, which are subject to industrial storm water permits). Accordingly, the Court will grant summary judgment to plaintiff on this claim and will instruct the County to submit a proposed revision or addendum to its SWMP to comply with Part III.B.6.c of its NPDES Permit.

With respect to item twelve, the Permit's provisions on the "pollution prevention/good housekeeping program for municipal operations" further require that the County's SWMP "address" the matter of "maintenance schedules" for the MS4. NPDES Permit, Part III.B.6.d.iii.1. The Court

finds that the County's SWMP does in fact address maintenance schedules for the MS4. The SWMP provides that the County will work with agency partners to "annually" "maintain and clean MS4 infrastructure." SWMP at p. 56. The annual maintenance to the MS4 will include cleaning, installation, replacement, and repair work to storm tiles, ditches, and catch basins. *Id.* Plaintiff has not attempted to demonstrate how these provisions of the SWMP fail to comply with the Permit.

The Court thus grants summary judgment to the County on items seven, twelve and thirteen of Count Eight, and it grants summary judgment to plaintiff on item ten.

### C.      Count Ten

In Count Ten plaintiff asserts a state law claim for negligence, alleging that the County has been negligent in operating the MS4. He contends that the odors caused by illicitly-discharging HSTSs in his neighborhood have caused him to suffer loss of the use and enjoyment of his real property and suffer loss to value to his real property.

The Court finds that the County is entitled to immunity against the negligence claim. Under Ohio's Political Subdivision Tort Liability Act, a political subdivision is "not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." O.R.C. § 2744.02(A)(1); *see also* O.R.C. § 2744.01(F) (defining "political subdivision" to include a county).

A "governmental function" includes the "provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system." O.R.C. § 2744.01(C)(2)(l). A proprietary function includes the "maintenance, destruction, operation, and upkeep of a sewer system." O.R.C. § 2744.01(G)(2)(d).

The distinction between governmental and proprietary functions matters because the Act creates a limited exception to immunity for the negligent performance of proprietary functions. O.R.C. § 2744.02(B)(2); *Coleman v. Portage Cnty. Eng'r*, 133 Ohio St.3d 28, 33–34, 975 N.E.2d 952, 957 (Ohio 2012).

A key factor in the difference between a governmental and a proprietary function is whether remedying the complained-of failure or omission "would involve little discretion but, instead, would be a matter of routine maintenance, inspection, repair, removal of obstructions, or general repair of deterioration." *Coleman*, 133 Ohio St.3d at 37, 975 N.E.2d at 960 (internal quotation marks omitted). If remedying the problem would involve little discretion, then the negligence claim concerns a proprietary function for which there may be an exception to political subdivision immunity. *Id.* If,

however, remedying the problem would entail discretionary judgments over redesigning, reconstructing, or upgrading the sewer system, then the claim concerns a governmental function for which the political subdivision enjoys immunity. *Id.*

An Ohio court therefore has held that a claim for injury arising from a political subdivision's alleged failure to perform routine maintenance, which would have prevented cracks in a sewer line, related to a proprietary function. *See Pierce v. Gallipolis*, 2015-Ohio-2995, 39 N.E.3d 858 (Ohio Ct. App. 2015); *see also Williams v. Glouster*, 2012-Ohio-1283, 2012 WL1029470 (Ohio Ct. App. 2012) (claim for failure to remove clog to storm drain related to a proprietary function). But a claim that a county failed to upgrade the capacity of its storm sewer system implicated questions of design and construction and therefore related to a governmental function. *Coleman*, 133 Ohio St.3d at 37, 975 N.E.2d at 960.

The Court finds here that plaintiff's negligence claim concerns the County's governmental function. Plaintiff alleges that the County breached a duty to prevent and remedy illicit discharges from HSTSs to the MS4. His claim does not concern a failure of upkeep or maintenance to the MS4; that is, he does not allege that there is anything wrong with the MS4 itself, such that the harm to plaintiff could be remedied by routine maintenance or repair which would return the MS4 to a preexisting condition. *See Coleman*, 133 Ohio St.3d at 35, 975 N.E.2d at 958. Plaintiff does not allege, for instance, that the County has neglected to repair storm drains or catch basins.

Rather, plaintiff's claim concerns an alleged failure by the County to devise and execute an effective plan to address and eliminate certain HSTSs that have been installed by homeowners and discharge to the MS4. As can be readily appreciated from a reading of the NPDES Permit and the applicable regulations, creating and implementing that type of plan involves many discretionary and non-routine determinations. *See Malone v. Chillicothe*, 2006-Ohio-3268, ¶ 20, 2006 WL 1745052 (Ohio Ct. App. 2006) (considering whether the city's conduct involved "the creative exercise of political judgment that goes to the heart of government"). It involves judgment calls about, among other things, evaluating the feasibility of connecting homes to the sanitary sewer system, determining what areas of the County will receive priority for connection to the sanitary sewer system, allocating limited public resources, establishing timetables, cooperating with the Ohio EPA, coordinating with local agencies, and communicating with homeowners and the public. In short, the remedy to plaintiff's injury is not the repair or upkeep of the existing system but the development and execution of plans to eliminate certain HSTSs, which necessarily involves the design, construction, and upgrade of the County's sanitary sewer system.

Plaintiff's negligence claim thus relates to an act or omission by the County in connection with a governmental function and the County is immune from liability. O.R.C. § 2744.02(A)(1).

## V.  Conclusion

Accordingly, the County's motion for summary judgment concerning the diligent prosecution bar (doc. 71) is granted in part and denied in part. It is granted as to Counts One, Two, Three, Seven, portions of Eight (items 1, 2, 3, 4, 5, 6, 8, 9, and 11), and Nine. It is denied as to Counts Five and portions of Eight (items 7, 10, 12, and 13).

The County's merits-based motion for summary judgment (doc. 45) is granted in part and denied in part. It is granted as to Counts Five, portions of Eight (items 7, 12, and 13), and Ten. It is denied as to item 10 of Count Eight, and denied as moot in all other respects.

Plaintiff's motion for partial summary judgment (doc. 16) is granted as to item 10 of Count Eight, but denied in all other respects. The County is hereby ORDERED to submit within thirty days of the date of this Order a proposed revision or addendum to its SWMP that complies with Part III.B.6.c of its NPDES Permit: "a list of industrial facilities you own or operate that are subject to Ohio [EPA's] Industrial Storm Water General Permit or individual NPDES permits for discharges of storm water associated with industrial activity that ultimately discharge to your MS4. Include the Ohio permit number or a copy of the Industrial [Notice of Intent] form for each facility." Once the County has submitted its proposed revision or addendum, plaintiff shall have ten days to raise any objections to the proposal.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: May 21, 2021